**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **MAYER BOTZ ENTERPRISES, LLC** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **No. 1:21-CV-00992-MIS-LF** |
| | § | |
| **CENTRAL MUTUAL INSURANCE** | § | |
| **COMPANY, and ERIC TRAINER** | § | |
| *Defendants.* | § | |
| | § | |

<u>**DEFENDANT CENTRAL MUTUAL INSURANCE COMPANY'S
AMENDED MOTION FOR SUMMARY JUDGMENT**</u>

Defendant Central Mutual Insurance Company ("Central") respectfully moves this Court for entry of final summary judgment in its favor and against Plaintiff Mayer Botz Enterprises, LLC ("Plaintiff") on all of Plaintiff's claims, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.[1] In support thereof, Central shows the Court the following:

## I.     SUMMARY OF THE ARGUMENT

This is a first-party insurance coverage dispute arising out of a claim for property damage allegedly resulting from a purported wind and hailstorm occurring on or around August 27, 2019. Plaintiff asserts four causes of action: breach of contract, common law bad faith, and violation of the New Mexico Insurance Code, New Mexico Unfair Insurance Practices Act ("UIPA") and New Mexico Unfair Practices Act ("UPA").[2] Central is entitled to summary judgment on all of Plaintiff's claims against it because Plaintiff cannot establish a covered loss, as there is no evidence the claimed property damage occurred within the applicable policy period. Rather, the evidence

---

[1]Per conference with Plaintiff's counsel on October 28, 2022, all parties agree to filing exhibits in excess of fifty pages pursuant to D.N.M.L.R.-Civ 10.5.
[2]*See* Plaintiff's Original Complaint [Doc. #1-1] ¶¶25–37.

establishes only that the claimed damage occurred outside of the policy period and is the result of

wear, tear, and deterioration. Central has no contractual obligation to cover such damages.

Furthermore, regardless of coverage, Plaintiff's common law bad faith and statutory claims

fail as a matter of law because the record conclusively establishes Central made a timely and

thorough investigation of Plaintiff's claim. Central treated Plaintiff fairly and acted in good faith.

Further, Central's liability never became "reasonably clear" and Central had not only a reasonable,

but an uncontroverted basis to deny coverage. Therefore, Central is entitled to judgment as a matter

of law on all of Plaintiff's claims against it.[3]

## II.   SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56, summary judgment is appropriate if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine dispute as to any material fact and that the moving party is entitled to judgment

as a matter of law."[4] A movant need not negate the non-movant's claim, but need only point to

those portions of the record which demonstrate an absence of a genuine issue of material fact given

the relevant substantive law.[5] Where the non-movant bears the burden of proof at trial, the movant

may merely point to the absence of evidence and thereby shift to the non-movant the burden of

demonstrating there is an issue of material fact warranting trial.[6] If a movant establishes its

---

[3]Central's decision not to assert any argument or defense Central previously set forth in its Original Answer is not an abandonment or waiver of any such argument or defense. Central hereby reserves all such matters and defenses, and admits no liability.
[4]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *See* Fed. R. Civ. P. 56(a). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Hardy v. S.F. Phosphates Ltd.,* 185 F.3d 1076, 1079 (10th Cir. 1999). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).
[5]*Wolf*, 50 F.3d at 79; *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992).
[6]*See Nilson v. Peerless Indem. Ins. Co.*, 484 F. Supp. 3d. 1050, 1077 (D. N.M. 2020).

entitlement to judgment as a matter of law given uncontroverted facts contained in the documentary evidence, summary judgment will lie.[7]

Although the Court views evidence in a light most favorable to the non-movant, to avoid summary judgment, the non-movant must go beyond the pleadings and provide specific facts which require submission of the case to a jury, thus indicating a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.[8] The non-movant cannot simply rest on "conclusory statements because such statements do not suffice to create a genuine issue of material fact"[9] nor simply refer to arguments and allegations of counsel contained in a brief.[10] Rather, the non-movant must identify sufficient evidence, pertinent to the material issue, by reference to affidavit, deposition transcript, or specific exhibit incorporated therein.[11] Speculation, conjecture, and unsupported allegations are inadequate; the non-movant must put forth significantly probative evidence that requires submission to a jury.[12] An issue is not "genuine" if the evidence not support it or the evidence is "merely colorable" or "not significantly probative."[13]

If the non-movant fails to put forth such evidence supporting an essential element of its claim, summary judgment is appropriate.[14] The Court is not obligated to search the record to determine whether there exists dormant evidence which might require submission of the case to a jury.[15]

---

[7] *Thomas*, 968 F.2d at 1024.
[8] *Id; Celotex*, 477 U.S.at 324; *Wolf*, 50 F.3d at 796; *Levy v. H. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).
[9] *Speidell v. United States*, 978 F.3d 731, 739 (10th Cir. 2020).
[10] *Thomas*, 968 F.2d at 1024.
[11] *Id.* (citing *Phillips v. Calhoun*, 956 F.2d 949, 952–53 (10th Cir. 1992)).
[12] *Anderson*, 477 U.S. at 249–52; *Hansan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018); *Marquez v. Albuquerque Pub. Sch.*, 2020 WL 1703351, at *3 (D. N.M. Apr. 8, 2020).
[13] *Nilson*, 484 F. Supp. 3d at 1078 (citing *Anderson*, 477 U.S. at 5251); *see also Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014), *cert. denied*, 136 S.Ct. 410 (2015).
[14] *Celotex*, 477 U.S. at 322–23.
[15] *Thomas*, 968 F.2d at 1024.

Summary judgment is appropriate where the evidence is "so one-sided that one party must prevail as a matter of law"[16] and where evidence "clearly contradict[s]" plaintiff's version of the facts.[17] Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, there is no genuine issue for trial.[18]

### III.   STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1(b), Central states as follows:

1.      Central issued Policy No. CLP 9919848 to Plaintiff, with a policy period of August 1, 2019 to August 1, 2020 ("Policy"), which provided certain coverages for wind and hail damage to property located at 7910 Loraine Ct. NE, Albuquerque, NM 87113 ("Property") owned by Plaintiff,[19] subject to all the terms, limitations, exclusions, conditions, and duties contained therein and endorsements thereto. The Policy extends coverage only to loss or damage commencing during the policy period shown in the Declarations, which is August 1, 2019, to August 1, 2020 ("Policy Period").[20]

2.      On May 3, 2021, Plaintiff's Public Adjuster, Maria Lamego, first submitted a claim to Central ("Claim"), over twenty months after the alleged date of loss of August 27, 2019.[21]

3.      Plaintiff alleges a hailstorm struck the area where the Property is located on August 27, 2019, and inflicted damaged to the Property's roofs, doors, vents, stucco, plumbing, HVAC

---

[16]*Becker v. Bateman*, 709 F. 3d 1019, 1022 (10th Cir. 2013).

[17]*Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009); *Daye v. Cmty. Fin. Serv. Center, LLC*, 233 F. Supp. 3d 946, 985 (D. N.M. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)) ("Where opposing parties tell two different stores, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[18]*Nilson*, 484 F. Supp. 3d at 1078.

[19]**Exhibit A**, Policy, at p. 1.

[20]**Exhibit A**, Policy at pp. 1–2.

[21]**Exhibit B**, Claim Notice and Demand, at p. 1.

units, and other roof appurtenances.[22] Plaintiff also claims the Property developed leaks in the interior as a result of the hailstorm.[23] Central denies these allegations.

4.     In support of its claim, Plaintiff submitted the following: (1) a public adjuster's estimate for repairs to the roof with attached photographs, totaling $260,417.77;[24] (2) a bid for replacement of the HVAC units allegedly damaged and unable to be repaired;[25] (3) a Stormintel Hail Report;[26] and, (4) a Benchmark Hail Report.[27]

5.     The Property is more than twenty years old.[28] The roof and HVAC units have not been replaced in the past twenty years, and there have been no major repairs in the past twenty years.[29] The HVAC units are original to the building and were installed when the building was built in 2002.[30]

6.     There have been multiple hailstorms at the Property between 2002 and the beginning of the Central Policy Period.[31] Plaintiff provided Central with a hail report which shows *eight* hailstorms at the Property and *fourteen* hailstorms within one mile of the Property prior to Central's Policy Period.[32] Another wefather report shows *four* hailstorms within one mile of the Property and one hailstorm at the Property in 2010.[33] The hail reports show hail prior to Central's Policy Period ranging from 0.75-inches to 2.0-inches in diameter.[34]

---

[22]*See* **Exhibit B,** Claim Notice and Demand, at pp. 3–4.
[23]**Exhibit C**, Plaintiff's Rsp. to Central's Interrogatories, at p. 3.
[24]*See* **Exhibit B**, Claim Notice and Demand, at pp. 3–4.
[25]**Exhibit D**, TLC Estimate.
[26]**Exhibit B**, Claim Notice and Demand, at p. 4.
[27]**Exhibit B**, Claim Notice and Demand, at p. 5.
[28]**Exhibit F**, Mayer Depo., at 35:13–14, 35:25–36:7.
[29]**Exhibit F**, Mayer Depo., at 38:4–24; 41:22–42:6; 95:2–7.
[30]**Exhibit J**, Crow Depo., at 30:22–31:4.
[31]*See e.g.,* **Exhibit B**, Claim Notice and Demand, at p. 5; **Exhibit P**, Roof Tech Report, at p. 13.
[32]**Exhibit B**, Claim Notice and Demand, at p. 5.
[33]**Exhibit P**, Roof Tech Report, at p. 13.
[34]**Exhibit B**, Claim Notice and Demand, at p. 5.

7.      Central acknowledged receipt of the Claim and began its investigation on May 4, 2021, one day after Plaintiff made the Claim.[35] Central assigned Randy Morgan of Team One Adjusting Services, LLC ("Team One"), an independent adjuster, to assist with its adjustment of the claim, and Scott Morrison, an engineer with Haag Engineering ("Haag"), to inspect the Property.[36]

8.      During Central's investigation, Plaintiff's public adjuster informed Central that Plaintiff previously reported an insurance claim for hail damage to both the roof and HVAC units at the Property to Liberty Mutual Insurance Company ("Liberty").[37] In the claim to Liberty, Plaintiff alleged a July 14, 2018, hailstorm damaged the Property,[38] which would have occurred within Liberty's policy period of August 1, 2017, through August 1, 2018.[39]

9.      During its investigation, Liberty retained Roderick Rennison, an engineer from Rimkus Consulting Group, Inc. ("Rimkus"), who inspected the Property on April 17, 2020, to determine the cause of damage to the Property.[40] Rennison's April 17, 2020, inspection was *during* the Central Policy Period, and *after* Plaintiff's alleged date of loss in its Claim to Central, August 27, 2019.[41]

10.     Rennison opined the physical evidence at the Property showed hail too small to have damaged the roofing materials at the Property.[42] Rennison explains spatter marks evidence recent hailstone impacts and hailstone sizes but only remain visible for a period of about twelve

---

[35]**Exhibit E**, Claim Acknowledgment.
[36]*See* **Exhibit K**, Team One Report, at p. 1; **Exhibit L**, Haag Report, at p. 1 ; **Exhibit G**, May 11, 2021 Correspondence.
[37]*See* **Exhibit M**, Central Mutual Internal Email, at p. 1; *see also* **Exhibit H**, Liberty Denial Letter, at p. 1.
[38]*See* **Exhibit N**, Rimkus Report, at p. 1.
[39]*See* **Exhibit H**, Liberty Denial Letter, at p. 1.
[40]**Exhibit N**, Rimkus Report, at p. 1.
[41]**Exhibit M**, Central Mutual Internal Email, at p. 1.
[42]**Exhibit N**, Rimkus Report, at p. 3–4.

months.[43] Rennison found hail spatter marks on or around the Property, indicating hail only up to 0.25-inch diameter hail had fallen within approximately one year of the inspection.[44] Rennison concluded the threshold for hail damage to the roofing materials is "significantly larger" than both the spatter marks he found and the widest flattened areas on the HVAC condenser fins.[45] Thus, Rennison determined the only indications of hail showed the hail was too small to damage the roofing materials.

11.     Rennison concluded there was ***no hail damage to the roof of the Property*** and the Property exhibited signs of age-related deterioration and prior repairs.[46] Rennison also found more granule loss around the HVAC units and the roof hatch, which pedestrian traffic on the roof in these areas had exacerbated.[47]

12.     Rennison found there was ***no hail damage to the metal roof panels*** at the Property.[48] Rennison concluded there were creases and fractures in the metal roof panels resulting from pedestrian traffic on the roof and there was age-related deterioration of the roof coverings and flashings.[49]

13.     Rennison concluded the ***hail damage to the HVAC units was the result of multiple hail storms occurring over the course of twenty years since the units had been installed***.[50] Rennison found hail damage and flattened areas of the HVAC condenser fins facing all cardinal directions and found hail stones up to approximately ¾ inch in width impacted the units from the

---

[43]**Exhibit N**, Rimkus Report, at p. 3.
[44]**Exhibit N**, Rimkus Report, at p. 3.
[45]**Exhibit N**, Rimkus Report, at pp. 3–4.
[46]**Exhibit N**, Rimkus Report, at p. 2, 3–4.
[47]**Exhibit N**, Rimkus Report, at p. 5.
[48]**Exhibit N**, Rimkus Report, at p. 6.
[49]**Exhibit N**, Rimkus Report, at p. 5–6.
[50]**Exhibit N**, Rimkus Report, at p. 4.

south and west.[51] Rennison concluded the size of the hail strikes on the HVAC units indicated hail too small to damage the roof.[52]

14.    The flattened HVAC fins were larger than the spatter marks Rennison identified, ***indicating the hail damage to the HVAC fins occurred more than a year before Rennison's inspection***, and thus prior to Central's Policy Period.[53]

15.    Based on physical observations of the Property, Rennison concluded the damage at the Property was "***not related to any single weather event but was, instead, the result of cumulative [damage] over a long period of time***."[54]

16.    Rennison determined the interior leaks at the property were the result of age-related deterioration, not storm damage.[55]

17.    As a result of Rennison's findings, Liberty partially denied Plaintiff's claim.[56] However, Liberty found its policy "does provide coverage for the hail damage sustained to the A/C fins and roof vent as previously determined and estimated for."[57] But Liberty denied coverage for the roof because the Property's roof exhibited only signs of wear, tear, and deterioration.[58]

18.    Plaintiff's claim to Liberty reveals the Property's HVAC units were damaged during Liberty's Policy Period, thus prior to Central's Policy Period, and the roof had no hail damage and only wear, tear, and deterioration as of April 17, 2020.[59]

---

[51]**Exhibit N**, Rimkus Report at p. 4.
[52]**Exhibit N**, Rimkus Report, at pp. 3–4.
[53]*See* **Exhibit N**, Rimkus Report, at p. 6 (noting spatter marks indicating 0.25-inch hail), p. 4 (noting hail up to 0.75-inches in diameter struck the HVAC condenser fins).
[54]**Exhibit N**, Rimkus Report, at p. 5 (emphasis added).
[55]**Exhibit N**, Rimkus Report, at pp. 5–6.
[56]**Exhibit H**, Liberty Denial Letter, at p. 2.
[57]**Exhibit H**, Liberty Denial Letter, at p. 2.
[58]**Exhibit H**, Liberty Denial Letter, at p. 2.
[59]*See* **Exhibit H**, Liberty Denial Letter, at p. 2.

19.     On behalf of Central, an adjuster from Team One inspected the Property on May 27, 2021.[60] Team One requested Plaintiff's representative to point out issues of concern.[61] Plaintiff's representative indicated areas of the stucco and roof allegedly damaged and advised of interior leaks.[62] Team One was unable to determine if the issues Plaintiff identified occurred during the policy period.[63]

20.     Morrison inspected the Property on behalf of Central on June 28, 2021, in an effort to provide an unbiased opinion on the damage to the Property.[64] During Morrison's inspection, Plaintiff's public adjuster advised Morrison the roof on the Property was original to the building, which was built in 2002, and has been on the Property for roughly twenty years.[65]

21.     Morrison opined the threshold size for hail damage to modified bitumen roofing to be 1.5 to 2.0-inches in diameter and the threshold size for hail damage to metal roofing is in excess of 2.5-inches in diameter.[66] Like Rennison, Morrison found spatter marks of only 0.25-inches in diameter, well below the threshold for damage.[67]

22.     Morrison's report concluded that, while there was some evidence of hail at the Property, the hail occurred prior to Central's Policy Period, and there was no evidence of hail larger than 1.25-inches in diameter, which Morrison opined was too small to have damaged the roofing at the Property.[68]

---

[60]*See* **Exhibit K**, Team One Final Report, at p. 1.
[61]**Exhibit K**, Team One Final Report, at p. 1.
[62]**Exhibit K**, Team One Final Report, at p. 2.
[63]*See* **Exhibit K**, Team One Final Report, at p. 2
[64]**Exhibit G**, May 11, 2021 Correspondence, at p. 2; **Exhibit L**, Haag Report, at p. 1.
[65]**Exhibit L**, Haag Report at p. 2.
[66]**Exhibit L**, Haag Report, at p. 4.
[67]*Compare* **Exhibit L**, Haag Report, at p. 2, *and* **Exhibit N**, Rimkus Report, at p. 3.
[68]**Exhibit L**, Haag Report, at pp. 2–5.

23.     Similar to Rennison, Morrison found **no hail damage to the modified bitumen roofing**.[69] Morrison did find sixty-four slight dents attributable to hailstone impacts on the base flashing at the Property, which he opined can be repaired.[70] Morrison found these impacts occurred *prior to* the Central Policy Period.[71] This damage does not warrant full roof replacement as Plaintiff claims.

24.     Just like Rennison, Morrison found **no hail damage to the metal roof panels** at the Property.[72] None of the base flashing of the metal roofing exhibited hail-caused damage.[73]

25.     According to Morrison, the hail marks on the HVAC units indicate hail of insufficient size to damage the roof and the HVAC units can be repaired.[74] The dents Morrison found on the HVAC condenser fins were larger than the spatter marks Morrison identified, indicating the hail damage to the HVAC fins is older than one to two years before Morrison's inspection.[75]

26.     Based on the physical evidence and weather reports, Morrison concluded the most likely date of the hailfall was July 30, 2018, based on Morrison's evaluation the physical evidence and the weather data,[76] nearly a *year prior* to both the alleged date of loss[77] and before the beginning of Central's Policy period.[78]

---

[69]*Compare* **Exhibit L**, Haag Report, at p. 2 *and* **Exhibit N**, Rimkus Report, at p. 2.
[70]**Exhibit L**, Haag Report, at pp. 4–5.
[71]*See* **Exhibit L**, Haag Report, at p. 5.
[72]*Compare* **Exhibit L**, Haag Report, at p. 5 *and* **Exhibit N**, Rimkus Report, at p. 5–6.
[73]**Exhibit L**, Haag Report, at p. 3.
[74]**Exhibit L**, Haag Report, at pp. 4–5.
[75]*See* **Exhibit L**, Haag Report, at p. 2 (noting spatter marks of 0.25-inches and dents on the fins of up to 1-inch in diameter).
[76]**Exhibit L**, Haag Report, at pp. 5–6.
[77]*See* **Exhibit E**, Claim Acknowledgment.
[78]*See* **Exhibit A**, Policy, at p. 1.

27.     On August 12, 2021, after reviewing the Haag report and documentation Plaintiff submitted, Central sent a denial letter to Plaintiff.[79] In this letter, sent two weeks after Central's receipt of the Haag report, Central explained the report indicates minor hail damage which most likely occurred on or about July 30, 2018.[80] Central further explained the reason for its denial of coverage: Central found no damaging hail events occurred during the Policy Period.[81] The letter also invited Plaintiff to contact Central if it discovered any hidden or additional damages.[82]

28.     In response to Central's letter, Plaintiff filed its Original Complaint on August 26, 2021.[83] Pursuant to Fed. R. Civ. P. 26(a)(2)(B), Central designated its retained engineering expert, Stephen L. Patterson of Roof Technical Services, Inc. ("Roof Tech").[84] Patterson inspected the property on November 17, 2021, and issued a report dated February 23, 2022.[85]

29.     Just like Rennison and Morrison, Patterson **found no evidence of hail damage to the Property's roofs**.[86] Like Morrison and Rennison, Patterson concluded there was no evidence of any hail at the Property large enough to damage the modified bitumen or metal roofs based on his review of the physical evidence of hail, the Property's condition, and the weather data.[87]

30.     Patterson concluded there were no openings in the roofs resulting from wind or hail.[88] The interior leaks resulted from maintenance issues and were unrelated to wind or hail.[89]

---

[79] **Exhibit O**, Central Denial Letter.
[80] **Exhibit O**, Central Denial Letter, at pp. 1–2.
[81] **Exhibit O**, Central Denial Letter.
[82] **Exhibit O**, Central Denial Letter, at p. 1.
[83] *See* Plaintiff's Original Complaint [Doc. #1-1].
[84] Defendant's Expert Disclosures [Doc. #32], at p. 1.
[85] **Exhibit P**, Roof Tech Report, at p. 1.
[86] **Exhibit P**, Roof Tech Report, at pp. 5, 7–10, 12.
[87] **Exhibit P**, Roof Tech Report, at p. 12.
[88] **Exhibit P**, Roof Tech Report at p. 5.
[89] **Exhibit P**, Roof Tech Report, at p. 12.

The reported leaks were all located beneath common sources of leaks, including drains,[90] wall-to-roof flashing and end laps,[91] HVAC units,[92] and areas of inadequate draining.[93]

31.    Just like Morrison and Rennison, Patterson noted small hail-caused dents on all exposure of the HVAC condenser coils, indicating **several hail events with small hail occurring ever since the units were installed**.[94]

32.    Patterson's opinion on the threshold size for hail damage to the Property's roofing materials is identical to Morrison's opinion.[95]

33.    Patterson found no hail damage to the aluminum roof coating repairs, which he notes "readily shows evidence of hail-caused impacts."[96] Patterson likewise found **no hail damage to the metal roofs**.[97]

34.    Patterson took three roof membrane samples from the Property which Roof Tech tested, none of which demonstrated evidence of hail damage.[98]

35.    Thus, Patterson's findings confirmed those of Morrison and Rennison: the leaks were not the result of storm-related openings, there was no hail of sufficient size to damage the roof within the Policy Period, and the hail damage to the HVAC units occurred across the lifetime of the units and *prior to* the Policy's effective date.

36.    Plaintiff's corporate representatives had no knowledge of when the claimed damage occurred.[99] Plaintiff's representative also had no knowledge of whether a hailstorm occurred in

---

[90]**Exhibit P,** Roof Tech Report at p. 1
[91]**Exhibit P,** Roof Tech Report at p. 6.
[92]**Exhibit P,** Roof Tech Report at p. 6.
[93]*See* **Exhibit P,** Roof Tech Report, at pp. 3–4.
[94]**Exhibit P,** Roof Tech Report, at p. 10.
[95]*Compare* **Exhibit P**, Roof Tech Report, at p. 12 *and* **Exhibit L**, Haag Report, at p. 4.
[96]**Exhibit P,** Roof Tech Report, at p. 11.
[97]**Exhibit P** Roof Tech Report, at p. 10.
[98]**Exhibit P,** Roof Tech Report, at pp. 7–8.
[99]**Exhibit F**, Mayer Depo. at 94:23–95:1.

August of 2019.[100] Plaintiff's corporate representatives could not identify a single thing Central should have done differently in its investigation.[101]

37.     The Policy excludes coverage for "loss or damage caused by or resulting from any of the following.

* * *

d.      (1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;[102]

* * *

38.     The Policy excludes coverage "for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises."[103]

---

[100]*See* **Exhibit I**, Valentine Depo., at 17:25–18:5.
[101]**Exhibit F**, Mayer Depo., at 112:6–11.
[102]**Exhibit A**, Policy, at p. 3.
[103]**Exhibit A**, Policy, at p. 4.

39.    The Policy provides coverage only for losses "commencing" during August 1, 2019, to August 1, 2020, subject to all Policy terms, provisions, limitations, duties, and endorsements.[104]

## IV.    ARGUMENT AND AUTHORITIES

Central fully incorporates the facts and evidence it referred to above as if fully set forth herein. Based on the above facts, the record is clear: Plaintiff cannot establish a covered loss under the Policy and Central had a reasonable basis from which to deny coverage, thereby precluding all of Plaintiff's causes of action against it. Central is entitled to summary judgment as a matter of law as to every cause of action Plaintiff asserts against it.

### A.  Plaintiff's Breach of Contract Claim Fails Because There was No Covered Loss Within the Policy Period.

A "basic rule of insurance law" is ***the insured has the burden*** of showing a covered loss has occurred, while the insurer has the burden of showing a loss falls within an exclusionary clause of the policy.[105] An insurer thus has no duty to indemnify the insured if the allegations fall outside of the policy's scope of coverage.[106] Summary judgment is appropriate where, as here, the insured cannot identify an "event that happened during the time the policy was in effect that caused direct loss or damage to its property."[107]

The terms of the Policy govern Central's obligations to Plaintiff and are a matter of contract law.[108] The Court's interpretation of the Central Policy and determination of the Parties' policy-

---

[104]**Exhibit A**, Policy, at p. 2.
[105]*Nilson*, 484 F. Supp. 3d at 1081 (citing *Battishill v. Farmers Alliance Ins. Co.*, 127 P.3d 1111 (N.M. 2006)); *see also Evanston Ins. Co. v. Desert State Life Mgmt.*, 434 F. Supp. 3d 1051, 1090 (D. N.M. 2020); *Pitman v. Blue Cross and Blue Shield of Ok.*, 217 F.3d 1291, 1298 (10th Cir. 2000).
[106]*See Certain Underwriters at Lloyd's London Subscribing Policy No. C112721/054 v. N.M. Psychiatric Serv. Corp.*, No. CV 14-00178 WJ/CG, 2015 WL 11670154, at *4 (D. N.M. Aug. 13, 2015).
[107]*See Leafland Grp.-II, Montgomery Towers Ltd., P. v. Ins. Co. of Na. Am.*, 881 P.2d 26, 28 (N.M. 1994).
[108]*Castro v. Zurich Am. Ins. Co.*, No. 20-cv-00622 WJ/CG, 2021 WL 1614634, at *4 (D. N.M. Apr. 26, 2021); *Knowles v. United Servs. Auto Ass'n*, 832 P.2d 394, 396 (N.M. 1992).

dictated rights and obligations are questions of law appropriate for summary judgment.[109] Absent an ambiguity, the Court "may not alter or fabricate a new agreement for the parties" and must enforce the language as written.[110]  Where a clause "read alone is clear and unambiguous. . . it is not necessary to read the coverages together," because "there is a risk of creating, rather than identifying, ambiguity."[111]

Here, the Policy clearly and unambiguous does not provide coverage for any loss or damage resulting from wear, tear, or deterioration, nor that which occurs outside of the Policy's period of August 1, 2019, to August 1, 2020.[112] The Policy provides coverage only to losses "commencing" during August 1, 2019, to August 1, 2020, subject to all Policy terms, provisions, limitations, duties and endorsements:

***

POLICY PERIOD:    FROM 08/01/2019 TO 08/01/2020
                         AT 12:01 A.M. STANDARD TIME AT YOUR MAILING
                         ADDRESS SHOWN ABOVE

***

**H.    POLICY PERIOD, COVERAGE TERRITORY**
        Under this Coverage part:
        1.  We cover loss or damage commencing:
              a.  During the policy period shown in the Declarations; . . .[113]

***

Considering the Policy's explicitly limited grant of coverage, Plaintiff cannot carry its burden of proving a covered loss because the claimed loss did not commence or occur within the Policy Period. While Plaintiff contends the hail which allegedly fell on August 27, 2019 "was

---

[109]*See Nabaani Twin Stars, LLC v. Travelers Cos.*, 497 F. Supp. 3d. 1011, 1018 (D. N.M. 2021); *Castro*, 2021 WL 1614634, at *3. New Mexico law treats an insurance policy as an ordinary contract and construes it according to customary principles of contract interpretation. *Carolina Cas. Ins. Co. v. Nanodetex Corp.*, 733 F.3d 1018, 1022 (10th Cir. 2013) (citing *Rummel v. Lexington Ins. Co.*, 945 P.2d 970, 976 (N.M. 1997)).

[110]*Lucero, Jr. v. Northland Ins. Co.*, 346 P.3d 1154, 1156 (N.M. 2015); *Espinosa v. United of Omaha Life Ins. Co.*, 137 P.3d 631, 639 (N.M. Ct. App. 2006); *Nabaani*, 497 F. Supp. 3d at 1018.

[111]*Bhasker v. Kemper Cas. Ins. Co.*, 361 F. Supp. 3d 1045, 1130 (D.N.M. 2019); *Castro*, 2021 WL 1614634, at *4; *Bakke*, at 889 (citing *Horn v. Law. Title Ins. Corp.*, 557 P.2d 206, 208 (N.M. 1976)).

[112]**Exhibit A**, Policy at pp. 1–2.

[113]**Exhibit A**, Policy at pp. 1–2.

unquestionably large enough to damage the property and such hail did in fact cause significant damage to the Property,"[114]  there is no evidence in support of Plaintiff's position that hail of sufficient size fell within Central's Policy Period **and** caused damage to the Property. Rather, the record establishes the damage to the Property commenced prior to Central's Policy Period, and the uncontested evidence shows the hail, if any, that fell during the Policy Period was not large enough to cause, and did not cause, the damage Plaintiff claims. Further, several other storms affected the Property prior to the Central Policy Period, dating back to the building's construction more than two decades ago.[115]

Three engineers inspected the Property and found no hail damage to the structure and no damaging hail strikes to the Property's roofs occurring within the Policy Period. Further, all three engineers have found the damage to the HVAC units resulted over time since the units were installed and was not the result of a single hail event.

First, in his April 2020 inspection, which occurred after Plaintiff's claimed date of loss in this litigation, Rennison found no hail damage to the roof coverings within a year of the inspection, no damage at all to the metal roofing, and determined the interior leaks were the result of age-related deterioration.[116] Rennison found old hail damage to the HVAC units, which occurred over time since the units were installed twenty years ago.[117] Although Rennison found hail spatter marks (which are not damage) indicating hail had struck the roof, Rennison concluded the hail was significantly smaller than the required threshold size for hail damage to the Property's roofing materials.[118]

---

[114]**Exhibit C**, Plaintiff's Response to Interrogatories, at p. 3.
[115]**Exhibit B**, Claim Notice and Demand, at p. 5.
[116]**Exhibit N**, Rimkus Report at pp. 2, 4–5.
[117]**Exhibit N**, Rimkus Report, at p. 4.
[118]**Exhibit N**, Rimkus Report, at p. 3.

Second, in his June 2021 inspection, Morrison found no hail damage to the modified bitumen and metal roofs as well as extensive tears, abrasions, footprints, and prior repairs.[119] Morrison found the largest signs of hail damage on the soft metals indicated the hail that struck the Property was below the threshold for damage to the roofing materials.[120] Morrison found July 30, 2018, a year prior to the Policy's effective date, to be the most likely date of hailfall, based on the physical evidence of hail and the weather data available.[121]

Third, in his November 2021 inspection, Patterson found no wind- or hail-caused openings in the roof, concluding the leaks were the result of construction and flashing issues.[122] Patterson found the damage to the HVAC units is the cumulative effect of hail storms occurring over the past twenty years.[123] Patterson provided the same opinion as Morrison on threshold hail size to damage the roofing materials, and found there had been no hail larger than 0.75-inches since 2010, well below the threshold for damage.[124] Patterson found no evidence of hail damage to the Property's roofs.[125]

Thus, none of the three engineers found hail damage to the Property's roofs and all three engineers opined no hail fell at the Property large enough to damage the roofs.[126] Plaintiff has not offered any evidence or opinions, expert or otherwise, to rebut the three engineers' findings. Taking the hail reports Plaintiff submitted as true for purposes of this motion, and assuming there was hail as large as 0.75 inches at the Property on August 27, 2019,[127] there is no genuine issue of

---

[119]**Exhibit L**, Haag Report, at pp. 2, 4.
[120]**Exhibit L**, Haag Report, at p. 3–4.
[121]**Exhibit L**, Haag Report, at pp. 4–5.
[122]**Exhibit P**, Roof Tech Report, at pp. 2, 5.
[123]*See* **Exhibit P**, Roof Tech Report, at p. 10.
[124]**Exhibit P**, Roof Tech Report, at p. 12.
[125]**Exhibit P,** Roof Tech Report, at pp. 7–9, 10, 12.
[126]**Exhibit L**, Haag Report, at pp. 4–5; **Exhibit N**, Rimkus Report, at p. 2; **Exhibit P,** Roof Tech Report, at p. 12.
[127]*See* **Exhibit B**, Claim Notice and Demand, at pp. 4–5.

material fact. The unrebutted expert opinions demonstrate hail of this size is of insufficient size to damage the types of roofs at the Property.[128] There is no evidence to the contrary in the record.

During depositions, Plaintiff's corporate representatives could not say whether hail on the alleged date of loss caused all, or any, of the items Plaintiff submitted in its claim to require repairs.[129] Rather, the representatives admitted this is "something experts would know,"[130] but the only designated experts in this lawsuit are Central's. All of them opine the claimed damage did not occur within Central's Policy Period. One corporate representative testified he could only assume when the claimed damage occurred.[131] Another admitted it was possible the damage could have occurred at any point over the past twenty years.[132] Plaintiff, admittedly, has no reason to dispute Morrison's conclusion that the most likely date of the hailfall was July 30, 2018.[133]

Rennison, Morrison, and Patterson all found no indication hail large enough to damage the roof during the Policy Period. All three engineers also found the leaks were unrelated to wind or hail, and several smaller hailstorms damaged the HVAC units over the course of the past twenty years. There is no evidence to controvert or question these expert opinions. Therefore, Central is entitled to summary judgment on Plaintiff's breach of contract claim because Plaintiff is unable to meet its burden of showing a covered loss.

**B. Plaintiff's Extracontractual Claims for Violation of the Duty of Good Faith and Fair Dealing, the UIPA, and the UPA All Fail as a Matter of Law.**

Plaintiff's extracontractual claims fail because Plaintiff's breach of contract claim is without merit and Plaintiff's bad faith claims are based on Central's refusal to pay benefits under

---

[128]*See* **Exhibit P**, Roof Tech Report at p. 12.
[129]**Exhibit F**, Mayer Depo., at 80:13–21, 80:24–81:2
[130]**Exhibit F**, Mayer Depo., at 81:4.
[131]**Exhibit J**, Crow Depo., at 28:20–29:10.
[132]**Exhibit F**, Mayer Depo., at 94:14–95:12; 110:25–111:12.
[133]**Exhibit J**, Crow Depo., at 86:17–87:7; **Exhibit I**, Valentine Depo., at 47:17–48:7.

the Policy.[134] An insured has no cause of action for bad faith failure to pay, whether under the common law, UIPA, or UPA, where, as here, the policy does not cover the insured's claim.[135] For this reason, Central is entitled to summary judgment on all of Plaintiff's extracontractual claims.

Regardless of whether there is coverage for Plaintiff's claim, Plaintiff has not alleged, and there is no evidence of, any actionable conduct on behalf of Central to support Plaintiff's bad faith claims. Rather, Central timely and thoroughly inspected the Claim, timely denied coverage based on reasonable grounds, and had significant evidentiary support for its determination. Therefore, Central is entitled to summary judgment as a matter of law on Plaintiff's extracontractual claims.

To show bad faith, Plaintiff must show: (1) Central refused to pay its claim for reasons which are "frivolous" or "unfounded"; (2) Central did not deal fairly with Plaintiff; (3) Central failed to act honestly and in good faith in the performance of the insurance policy; or, (4) Central did not act reasonably under the circumstances to conduct a fair evaluation of coverage.[136]

But if Central's reasons for denying the claim are simply erroneous or incorrect—which Central denies—simple errors do not impart bad faith liability.[137] Rather, bad faith requires the insurer to act with "reckless disregard" and the insurer to have "an utter or total lack of foundation for an assertion of nonliability—an arbitrary or baseless refusal to pay, lacking any arguable

---

[134]*See* Plaintiff's Original Complaint [Doc. #1-1], ¶24 ("Central. . . breached [its] duty of good faith and fair dealing ***by refusing to pay Plaintiff's claim***") (emphasis added). The only specific action of Central Plaintiff complains of is its failure to "promptly pay Plaintiff's claim." *See* Plaintiff's Original Complaint [Doc. #1-1], ¶32. Plaintiff does not identify any specific conduct on behalf of Central in violation the common law, UIPA, or UPA and only lists the text of the statutes. *See* Plaintiff's Original Complaint [Doc. #1-1], ¶¶28–37. Thus, Plaintiff's claims are all premised on Central's refusal to pay benefits under the Policy.

[135]*See Charter Servs, Inc. v. Principal Mut. Life Ins. Co.,* 868 P.2d 1307, 1313 (N.M. 1994); *OR&L Constr., L.P. v. Mountain States Mut. Cas. Co.*, 514 P.3d 40, 52 (N.M. Ct. App. 2022) ("an insured cannot raise a claim of bad faith based on an insurer's failure to pay a covered claim unless the insured can establish that coverage exists"); *Aztec Abstract & Title Ins. Co. v. Maxum Specialty Grp.*, 302 F. Supp. 3d 1274, 1286 (D. N.M. 2018) ("a court should dismiss bad faith and New Mexico Insurance Practices Act claims if there is . . . no right to indemnification under an insurance policy."); *see also Nabaani*, 497 F. Supp. 3d at 1024 (rejecting insured's argument that failure to properly investigate is an independent question from coverage).

[136]*Progressive Cas. Ins. Co. v. Vigil*, 413 P.3d 850, 857 (N.M. 2018) (citing *O'Neel v. USAA Ins.*, 41 P.3d 356, 360 (N.M. Ct. App. 2002)); *Chavez v. Chenoweth*, 553 P.2d 703 (N.M. Ct. App. 1976).

[137]*See Am. Nat. Prop. & Cas. Co. v. Cleveland*, 293 P.3d 954, 958 (N.M. Ct. App. 2012).

support in the wording of the insurance policy or the circumstances surrounding the claim."[138] There is no evidence whatsoever supporting such a finding here.

The Supreme Court of New Mexico has clarified: "[a]ny insurer that objectively exercises good faith and fairly attempts to settle its cases on a reasonable basis and in a timely manner need not fear liability under the [insurance] Code."[139] An insurer has the right, and it is neither bad faith nor a statutory violation, to refuse a claim if the insurer has reasonable grounds to deny coverage.[140] An insurer need not settle cases the insurer reasonably believes to be "without merit or overvalued."[141] "Where payment of policy proceeds depends on [a fairly debatable] issue . . . the insurer is entitled to debate that issue."[142] Bad faith requires an insurer's refusal to pay policy proceeds must not only be unreasonable, but the refusal must lack any arguable support.[143]

Where there is a genuine issue regarding the payment of benefits, the insurer cannot have acted in bad faith.[144] Plaintiff has no evidence Central engaged in bad faith or unfair practices under either the common law, UIPA, or UPA. Rather, the record conclusively establishes Central had a reasonable basis for the denial of Plaintiff's claims, dealt fairly with Plaintiff, acted reasonably to conduct a fair evaluation of coverage, and acted honestly and in good faith.

---

[138]*Sloan v. State Farm Mut. Auto. Ins. Co.*, 85 P.3d 230, 237 (N.M. 2004); *Jackson Nat'l Life Ins. Co. v. Receconi*, 827 P.2d 118, 134 (N.M. 1992). The implied covenant of good faith and fair dealing "cannot be used to override express provisions in a written contract." *Salas v. Mountain States Mut. Cas. Co.*, 202 P.3d 801, 805 (N.M. 2009).
[139]*Hovet v. Allstate Ins. Co.*, 89 P.3d 69, 78 (N.M. 2004).
[140]*United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 790 P.2d 649 (N.M. 1985); *Cleveland*, 293 P.3d at 958.
[141]*Nilson*, 484 F. Supp. 3d at 1087 (citing *Salopek, Tr. for Salopek Fam. Heritage Tr.  v. Zurich Am. Life Ins. Co.*, 428 F. Supp. 3d 609, 626 (D. N.M. 2019)).
[142]*United Nuclear*, 709 P.2d at 654; *Arble v. State Farm Mut. Ins. Co.*, No. 10cv147 WJ/WDS, 2011 WWL 13112569, at *3 (D. N.M. Sept. 16, 2011); *See Nilson*, 484 F. Supp. 3d. 1087.
[143]*Receconi*, 827 P.2d at 134.
[144]*United Nuclear*, 709 P.2d at 654; *Hauff v. Petterson*, 755 F. Supp. 2d 1138, 1145 (D. N.M. 2010); *see also Yumukoglu v. Provident Life & Acc. Ins. Co.*, 36 Fed. App'x 378, 382 (10th Cir. 2002) ("Because no rational jury could have included that [the insurer] lacked *any* reasonable basis . . . we affirm the district court's grant of summary judgment, in favor of [the insurer]. . .") (emphasis in original).

> **i.      Central's Reasonable and Timely Investigation Provided it a Reasonable Basis to Deny Coverage.**

Plaintiff's bad faith claims fail because Central conducted a reasonable, fair, and timely investigation which provided it a reasonable basis to deny coverage, and there is no evidence to rebut Central's findings.[145] Once an insurer performs its investigation and determines the policy does not cover insured's claim, no other performance is due from the insurer.[146] An insurer's investigation "need not be perfect" and must only be "reasonably appropriate under the circumstances."[147] While an insurer cannot "intentionally [delay] the coverage decision," the insurer is "justified in taking reasonable time and measures to investigate before determining whether coverage" exists under the policy.[148]

Central's investigation established the damage for which Plaintiff seeks recovery commenced prior to the Policy's effective period.[149] Central responded to Plaintiff's claim in one day and had a third-party adjuster inspect the Property within three weeks.[150] Central also retained Morrison to inspect the property and provide an engineering analysis.[151] Prior to denial, two engineers, one of which had no association with Central, determined the roof of the Property did not sustain hail damage within Central's Policy Period.[152] Central considered not only Morrison's report but all the information Plaintiff provided: hail reports, estimates, and the evidence of

---

[145]*See Cleveland*, 293 P.3d at 958 ("a reasonable ground [to believe a meritorious defense exists to the claim] flows from a reasonable investigation of the claim.)

[146]*OR&L Constr., L.P.*, 514 P.3d 40, 51.

[147]*Haygood v. United Servs. Auto. Assoc.*, 453 P.3d 1235, 1241 (N.M. 2019).

[148]*Id.* at 1242.

[149]*See infra*, Section IV.A.

[150]*See* **Exhibit K**, Team One Report; *Reeder v. Am. Econ. Ins. Co.*, 88 F.3d 892, 896 (10th Cir. 1996) (holding insurer taking over three months to evaluate a claim was timely and not in bad faith).

[151]*See* **Exhibit L**, Haag Report, at p. 1.

[152]*See* **Exhibit L**, Haag Report, at p. 5–6; **Exhibit N**, Rimkus Report, at p. 2.

Liberty's independent investigation.[153] After concluding Plaintiff's claim was not covered, Central owed no further duty to investigate.[154]

Once Central obtained the information it required to make a coverage determination, it advised Plaintiff of its decision within just two weeks.[155] After Central's denial, a third engineer's inspection confirmed the others' findings, thus providing no basis for Central to alter its coverage position.[156] Plaintiff did not produce any evidence prior to or after Central's denial sufficient to refute the engineers' findings.

Plaintiff's own representative admitted he could not state the date on which the claimed damage occurred.[157] Plaintiff's representatives further admitted they had no reason to disagree with the expert reports of Morrison or Rennison, noting Plaintiff would need to hire its own engineer to dispute the report.[158] Plaintiff further admitted it has no reason to believe Central should not have relied on Morrison's report.[159] Yet Plaintiff has failed to provide an expert opinion to rebut Central's engineers' reports.

Despite Plaintiff's characterizations to the contrary, there is no evidence Central's investigation of the Claim was anything other than reasonable, timely, and thorough.[160] The results of Central's inspection support its denial, which it based on the Policy's expressly limited grant of coverage to only losses commencing during the Policy Period.[161] Central's investigation

---

[153]*See* **Exhibit O**, Central Denial Letter ("Based on the engineer inspection, reports, photos and the [Rimkus] report provided by your public adjuster, we find that there was no damaging hail events that occurred during our policy period.").

[154]*See O&RL Constr.*, 514 P.3d at 51.

[155]*Compare* **Exhibit L**, Haag Report, at p. 1 *and* **Exhibit O**, Central Denial Letter.

[156]*See* **Exhibit P**, Roof Tech Report, at p. 12.

[157]**Exhibit F,** Mayer Depo., at 94:14–95:1.

[158]*See* **Exhibit F**, Mayer Depo., at 87:13–18; 89:17–22 (Plaintiff's corporate representative admitting he was "not at liberty to dispute" Haag's conclusion as to the most likely date hail damaged the Property).

[159]**Exhibit F**, Mayer Depo., at 102:10–103:4.

[160]*See* **Exhibit F**, Mayer Depo., at 103:5–104:21 (Plaintiff's representative admitted to having no facts to support the claim that Central's denial was frivolous or founded and to having no reason to believe Haag's report was incorrect); *Yumukoglu,* 36 Fed. App'x at 382.

[161]**Exhibit O**, Central Denial Letter.

indisputably gave it a reasonable basis from which to deny Plaintiff's claim. Further, there is no evidence coverage for Plaintiff's claim became "reasonably clear" at any point. Thus, Central is entitled to summary judgment as a matter of law on Plaintiff's extracontractual claims.

### ii.    Central Dealt with Plaintiff Fairly, Honestly, and in Good Faith.

New Mexico law obligates Central to treat Plaintiff fairly, which means Central "cannot be partial to its own interests but must give its interests and the interests of its insured equal consideration."[162] Plaintiff's bad faith claims fail because the record contains no indication Central was partial to its own interests. There is no evidence Central misrepresented any provision of the Policy or the extent of coverage to Plaintiff. Nor is there any evidence which calls Central's determination into question, or which would refute its reliance on the expert's opinion.

Central considered all the evidence Plaintiff submitted[163] and its investigation was timely and reasonable.[164] Central communicated with and invited Plaintiff's public adjuster to supply information to Morrison if she thought it important.[165] Plaintiff's representatives could not identify a single thing Central should have done differently in investigating the claim[166] and could not identify any misrepresentations Central made regarding the Policy or its scope of coverage.[167] Plaintiff's representative could not say whether Central's denial was improper.[168] Finally, Central clearly explained the basis for its denial of Plaintiff's claim.[169]

---

[162]*Dairyland Ins. Co. v. Herman*, 954 P.2d 56, 61 (N.M. 1997).
[163]*See* **Exhibit O**, Central Denial Letter.
[164]*See infra*, Section IV., B. ii.
[165]*See* **Exhibit G**, May 11, 2021 Correspondence, at p. 1.
[166]**Exhibit F**, Mayer Depo at 112:6–11.
[167]*See* **Exhibit F**, Mayer Depo., at 57:25–58:8.
[168]**Exhibit F**, Mayer Depo., at 93:2–5.
[169]**Exhibit O**, Central Denial Letter, at p. 2 ("'Based on the engineer inspection, reports, photos and the report provided by your public adjuster, [Central finds] that there was no damaging hail events that occurred during [Central's] policy period.")

Central conclusively did not act in bad faith and did not violate the UIPA or UPA and is, therefore, entitled to summary judgment on Plaintiff's extracontractual claims as a matter of law.

**C. Central is Entitled to Summary Judgment on Plaintiff's Claim for Punitive Damages.**

To recover punitive damages, Plaintiff must show Central's "conduct was in reckless disregard for the interests of the plaintiff, or was based on dishonest judgment, or was otherwise malicious, willful, or wanton."[170] As demonstrated above, there is no evidence Central refused to pay Plaintiff's claim for frivolous or unfounded reasons.[171] Similarly, there is no evidence Central acted with "reckless disregard" for Plaintiff's interest, acted based on dishonest judgment, or was otherwise malicious, willful, or wanton. Thus, Central is entitled to summary judgment on Plaintiff's claim for punitive damages.

## V.   CONCLUSION

Central is entitled to summary judgment as a matter of law on all of Plaintiff's claims because Plaintiff cannot meet its burden of proving a covered loss. Rather, the record conclusively establishes Plaintiff's claim is outside the Central Policy's scope of coverage. Three engineers inspected and all concluded there was no hail damage to the Property's roofs, the HVAC units sustained damage prior to the Central Policy Period over the course of twenty years, and there was no hail large enough to damage the Property's roofs. Plaintiff's conclusory allegations to the contrary are not evidence, and thus there is no material question of fact: the Policy indisputably does not cover Plaintiff's claim.

Because Plaintiff's claim is not covered, Plaintiff's extracontractual claims must likewise fail. Assuming *arguendo* there is a fact question of whether coverage exists, Central's investigation

---

[170]*See Sloan*, 85 P.3d at 232.
[171]*See id.*; *Ingwaldson v. Moore*, No. 19-cv-00801 MIS/JFR, 2022 WL 704132, at *6 (D. N.M. Mar. 9, 2022) ("Because Plaintiff's bad faith claims [fail]. . . Plaintiff's claims for punitive damages also fail as a matter of law.").

was indisputably thorough, timely, fair, and in good faith. Central's investigation provided Central with a reasonable and uncontroverted basis to deny coverage. Therefore, Central is entitled to summary judgment as a matter of law on all of Plaintiff's claims against it.

### PRAYER

**WHEREFORE**, Defendant Central Mutual Insurance Company prays the Court grant its Motion for Summary Judgment in all respects, as set forth herein, on Plaintiff's entire suit against it; or, alternatively, on those claims the Court deems proper. Central further prays the Court grant Central such other and further relief, at law and in equity, as the Court deems just and right and to which Central proves itself entitled.

Respectfully submitted,

**PHELPS DUNBAR, L.L.P.**

BY: /s/ ***Clinton J. Wolbert***

Clinton J. Wolbert
*Admitted pro hac vice*
Federal I.D. 3041729
E-Mail: clinton.wolbert@phelps.com
910 Louisiana Street, Suite 4300
Houston, Texas 77002
Telephone:713 626 1386
Facsimile: 713 626 1388

William R. de los Santos
*Admitted pro hac vice*
E-Mail: william.delossantos@phelps.com
2102 E. State Hwy. 114, Suite 207
Southlake, Texas 76092
Telephone: 817 488 3134
Facsimile: 817 488 3214

**ATTORNEYS FOR DEFENDANT, CENTRAL MUTUAL INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been forwarded to the below counsel in accordance with the Federal Rules of Civil Procedure on October 28, 2022

M. Mitchell Moss                      *VIA ECF/EMAIL: mitch@mosslegalsolutions.com*
Cindy M. Vazquez                      *VIA ECF/EMAIL: cindy@mosslegalsolutions.com*
Moss Legal Group, PLLC
5845 Cromo Drive, Suite 2
El Paso, Texas 79912

Charles K. Purcell                    *VIA ECF/EMAIL: kpurcell@rodey.com*
Rodey, Dickason, Sloan, Akin & Robb, P.A.
P.O. Box 1888
Albuquerque, NM 87103

*/s/ Clinton J. Wolbert*
Clinton J. Wolbert